IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JANE DOE,<br><br>Plaintiff,<br><br>v.<br><br>CAPITAL HEALTH SYSTEM, INC.,<br>d/b/a CAPITAL HEALTH,<br><br>Defendant. | Civil Action No. _____<br><br>Removed from the Superior Court of New<br>Jersey, Law Division, Mercer County<br>Case No. MER-L-000148-23 |

## NOTICE OF REMOVAL

This case seeks to undermine the substantial efforts of Defendant Capital Health System, Inc., d/b/a Capital Health ("Capital Health") to fulfill longstanding federal policy to expand the use of electronic health records ("EHR") and bring the U.S. health infrastructure into the 21st century. Plaintiff Jane Doe ("Plaintiff") challenges common methods by which both the federal government and private healthcare providers seek to increase patient engagement with EHR. In Capital Health's case, that engagement occurs largely through Capital Health's websites, including www.capitalhealth.org, and related online patient access offerings (the "Capital Health Websites"). The Capital Health Websites allow patients and their authorized agents to access health information remotely and to communicate with their physicians in a secure digital environment. The Capital Health Websites are also a key part of how Capital Health implements a partnership with the federal government, which specifically directs Capital Health to achieve increasing benchmarks in the use of interoperable health technology. Meeting these federal benchmarks means raising awareness of the Capital Health Websites, and Plaintiff now asserts that the means for doing so violate New Jersey law. Indeed, she seeks recovery on behalf of a putative class. The claims fail on multiple grounds—including that the information at issue is not protected health

information, and that Capital Health shares no protected health information outside of the Capital Health Websites—but their mere existence is effectively asking a court to intervene in the operation of a federal program and hold that the federal government, Capital Health, and most other healthcare systems are all violating state law.

These kinds of claims belong in federal court. Accordingly, pursuant to 28 U.S.C. §§ 1332, 1367, 1441, 1442, 1446, and 1453, and with full reservations of all defenses, Capital Health gives notice of the removal of this action originally filed in the Superior Court of New Jersey, Law Division, Mercer County, as Case No. MER-L-000148-23, to the United States District Court for the District of New Jersey. In support of removal, Capital Health provides this "short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a); *see also Dart Cherokee Basis Operating Co., LLC v. Owens*, 574 U.S. 81, 87 (2014) ("By design, § 1446(a) tracks the general pleading requirement stated in Rule 8(a) of the Federal Rules of Civil Procedure.").[1]

## NATURE OF REMOVED ACTION

1.      On January 24, 2023, Plaintiff—who seeks to proceed anonymously under the pseudonym Jane Doe—filed a complaint in the Superior Court of New Jersey, Mercer County, alleging claims related to the operation of the Capital Health Websites.

2.      The Complaint—one of several similar lawsuits that have been filed across the United States—asserts that routine online practices violate a plethora of state laws. Some of these lawsuits have already been dismissed, with motion practice ongoing in others. As far as Capital Health is aware, none has resulted in any kind of liability. Nor should they. The online practices alleged here are commonplace features and functions of almost all websites, including those

---

[1] Capital Health is the named defendant and appears here in the exercise of its rights of removal under federal law. Capital Health denies the allegations and relief sought in the Complaint, denies any liability to Plaintiff or the members of the putative class, and reserves all procedural, substantive, and other defenses, arguments, and claims available in response to the Complaint, including without limitation the defense that Capital Health is not a provider or covered entity and is an improper defendant, and its right to contest any class certification.

2

maintained by the federal government and private healthcare providers across the country. Moreover, as one federal court already held in dismissing a similar case with prejudice, the kind of general, public browsing information at issue does not relate to the healthcare of any given individual and does not enjoy any special protection: "Nothing about that information relates specifically to Plaintiffs' health." *See Smith v. Facebook*, 262 F. Supp. 3d 943, 954-55 (N.D. Cal. 2017).

3.      Thus, while the Complaint uses selectively-quoted material to create an impression of impropriety, none of the information at issue in the Complaint is protected, and none of the allegations give rise to a claim. Capital Health uses health information technology ("health IT") to provide patients and their authorized agents access to Capital Health as a way to manage their healthcare through online means. None of *that* information is shared with outside entities except as allowed under federal law.

4.      The claims in this lawsuit thus suffer from myriad defects under both federal and state law. But Plaintiff's claims also implicate unique federal interests, making this case removable to federal court.

5.      Since at least 2004, the federal government has—through executive order, major legislation, and administrative programs—overseen the development of a nationwide infrastructure for health IT and EHR. To achieve that goal, the federal government has established its own patient portal and sought to steadily increase its utilization among patients through targeted advertising. The federal government also has encouraged private healthcare providers to develop and maintain their own patient online access offerings, and has made special federal payments to those providers that voluntarily endeavor to expand patients' use of portals and access to EHR in meaningful ways. This case challenges the legality of techniques and practices that the federal

government and the providers it pays use to meet that goal.  The action is therefore removable pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1).

## PROCEDURAL REMOVAL REQUIREMENTS

6.      Venue is proper in this Court under 28 U.S.C. § 1441(a) because the United States District Court for the District of New Jersey geographically subsumes the Superior Court of New Jersey, Mercer County, in which Plaintiff filed the Complaint.  *See* 28 U.S.C. § 110.

7.      This Notice is timely because thirty days have not yet elapsed from Capital Health's receipt of the Complaint, through service or otherwise, on February 3, 2023.  *See* 28 U.S.C. § 1446(b); Fed. R. Civ. P. 6(a)(1)(C).

8.      Copies of all State Court process, pleadings, and orders served on Capital Health are attached as Exhibit A, as required by 28 U.S.C. § 1446(a).

9.      A written notice attaching a copy of this Notice of Removal is being served on Plaintiff and filed with the Clerk of the New Jersey Superior Court, as required by 28 U.S.C. § 1446(d).

## BASIS FOR REMOVAL

**Removal is Proper Pursuant to the Federal Officer Removal Statute, 28 U.S.C. § 1442(a)(1).**

10.      The federal officer removal statute, 28 U.S.C. § 1442(a)(1), allows Capital Health to remove this action.  This basis for removal exists to protect operations of the federal government from State interference. *See In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Phila.*, 790 F.3d 457, 466 (3d Cir. 2015) ("*Def. Ass'n*") (citing *Watson v. Phillip Morris Cos., Inc.*, 551 U.S. 142, 150 (2007)).  Thus, "[u]nlike the general removal statute, the federal officer removal statute is to be 'broadly construed' in favor of a federal forum." *Id.* 466-67 (citing *Sun Buick, Inc. v. Saab Cars USA, Inc.*, 26 F.3d 1259, 1262 (3d Cir. 1994)); *see also Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1252 (9th Cir. 2006) (citing *Colorado v.*

*Symes*, 286 U.S. 510, 517 (1932)) (noting "the Supreme Court has mandated a generous interpretation of the federal officer removal statute.").

11.    Removal under the federal officer statute is proper here because (1) Capital Health is a "person" within the meaning of the statute; (2) Plaintiff's claims are based upon Capital Health's conduct in "acting under" the United States, its agencies, or its officers; (3) Plaintiff's claims against Capital Health are "for, or relating to" an act under color of federal office; and (4) Capital Health raises colorable federal defenses to the claims. *See Def. Ass'n*, 790 F.3d at 467 (holding that state court disputes were properly removed where they pertained to how a Pennsylvania non-profit administered authority delegated to it under federal law and how it utilized related federal funds); *see also Golden v. N.J. Inst. of Tech.*, 934 F.3d 302 (3d Cir. 2019) (holding removal proper where the dispute implicated governmental confidentiality interests under federal law). Capital Health's actions in response to the federal government's directives are the classic case when a private contractor helps the federal government by producing an item that it needs. *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 812 (3d Cir. 2016).

12.    Like other similarly situated defendants, Capital Health meets each of these requirements. *See, e.g., Doe, et al. v. UPMC*, 2020 WL 4381675, *7 (W.D. Pa. Jul. 31, 2020), *interlocutory appeal denied*, 2020 WL 5742685 (W.D. Pa. Sept. 25, 2020) ("UPMC has shown that by its participation in the Meaningful Use Program, it was 'acting under' DHHS when it engaged in the conduct that is at issue in the Complaint."); *Doe v. ProMedica Health Sys., Inc.*, 2020 WL 7705627, *3 (N.D. Ohio Oct. 30, 2020), *appeal denied*, 2020 WL 7705713 (N.D. Ohio Dec. 14, 2020) ("Because Defendant's participation assisted the federal government in achieving that goal [to create a unified system of patient electronic health records], Defendant has satisfied the 'acting under' prong").

ME1 44305500v.1

**A.    Capital Health is a "Person."**

13.    Any "person" acting under a federal officer may remove an action to federal court pursuant to Section 1442(a)(1).

14.    "Because the statute does not define 'person,' [courts] look to 1 U.S.C. § 1, which defines the term to 'include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals.'" *Def. Ass'n*, 790 F.3d at 467.

15.    Capital Health is a New Jersey non-profit corporation. *See, e.g.*, Exhibit A (Complaint), ¶ 7. It therefore qualifies as a person for removal purposes. *Def. Ass'n*, 790 F.3d at 468 ("As a non-profit corporation, the Defender Association of Philadelphia falls within this definition.").

**B.    Capital Health is Acting Under a Federal Officer.**

16.    "The 'acting under' requirement, like the federal removal statute overall, is to be 'liberally construed' to cover actions that involve 'an effort to assist, or to help carry out, the federal supervisor's duties or tasks.'" *Papp*, 842 F.3d at 812 (marks and citation omitted). The question is not whether the specific conduct alleged in the Complaint was itself "at the behest of a federal agency. It is sufficient for the 'acting under' inquiry that the allegations are directed at the relationship between" the defendant and the federal government. *Def. Ass'n*, 790 F.3d at 470. "The hurdle erected by this requirement is quite low." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008). Non-governmental corporate defendants need only "demonstrate that the acts for which they are being sued…occurred because of what they were asked to do by the Government." *Id.*

17.    Capital Health is a regional health care system comprised of two hospitals (Regional Medical Center in Trenton, NJ, and Capital Health Medical Center – Hopewell in Hopewell, NJ), Capital Health – Hamilton outpatient facility in Hamilton, NJ; over 50 primary and

specialty care practices in southern NJ and eastern PA, as well as a virtual primary care portal for NJ and PA residents (collectively, the "Capital Health Providers").

18.    The allegations here squarely target the relationship between the Capital Health Providers and the federal government.  Those providers contract with the government, provide care for thousands of federally-subsidized patients every day, and help administer a nationwide federal effort to expand the use of health IT.  The federal government makes special payments to providers—including Capital Health Providers—that increase patient engagement with EHR through the use of online patient access offerings.  Plaintiff's allegations pertaining to the design and functionality of the Capital Health Websites implicate how the Capital Health Providers execute this federal program, meet federally-mandated criteria regarding health IT, and qualify for federal payments.

> **1.    As one of the largest purchasers of healthcare services, the federal government has a unique interest in health IT.**

19.    The federal government plays a central role in healthcare in the United States generally, and in the use of health IT in particular.

20.    Through the Department of Veteran Affairs ("VA"), the Department of Health and Human Services ("HHS"), and the Centers for Medicare & Medicaid Services ("CMS"), the federal government pays directly for, or subsidizes, healthcare for tens of millions of people through massive programs like traditional Medicare, Medicare Advantage, and Medicaid.  Overall, the federal government is one of the largest purchasers of healthcare services, spending over $1 trillion each year.

21.    To protect its interests, the federal government has emphasized the important role that health IT plays in improving both the quality and efficiency of healthcare in the United States.  As a federal officer within HHS recently explained:

> Federal agencies are purchasers, developers, and regulators of health IT. They fund and contribute to health IT research, health IT development, and health IT deployment at the local, Tribal, state, and national levels. Federal agencies also facilitate coordination across the public and private sectors to align standards, encourage innovation, share best practices, and promote competition. In addition, they have the responsibility of developing regulations that impact health IT and providing oversight for its use.
>
> Beyond actions aimed at strengthening the health IT infrastructure and lowering barriers to access, exchange, and use of EHI, federal agencies use health IT to achieve their missions and serve the nation every day. For example, agencies use EHRs, data systems, and other health IT to conduct public health surveillance and research, provide healthcare services to patients, and administer government benefit programs such as Medicare and Medicaid

Office of the Nat'l Coordinator for Health Info. Tech., *2020-2025 Federal Health IT Strategic Plan* at 8, available at https://www.healthit.gov/sites/default/files/page/2020-10/Federal%20Health%20IT%20Strategic%20Plan_2020_2025.pdf (last visited March 1, 2023).

22.    The federal government has also established specific offices to expand the use of EHR and other health IT.  In 2004, President Bush issued an Executive Order establishing a National Health Information Technology Coordinator.  *See* Exec. Order 13,335, 69 Fed. Reg. 24,059 (Apr. 27, 2004), available at https://www.govinfo.gov/content/pkg/WCPD-2004-05-03/pdf/WCPD-2004-05-03-Pg702.pdf (last visited March 1, 2023).  That office was charged with overseeing "nationwide implementation of interoperable health information technology in both the public and private health care sectors."  *Id.*

23.    Five years later, Congress then codified this model in the Health Information Technology for Economic and Clinical Health Act of 2009 ("HITECH Act").  That legislation created the Office of the National Coordinator for Health Information Technology ("ONC") and earmarked billions of federal dollars to help create, among other things, a "[h]ealth information technology architecture that will support the nationwide electronic exchange and use of health

information in a secure, private, and accurate manner." Pub. L. No. 111-5 § 3011(a)(1), 123 Stat. 115, 247 (2009) (codified at 42 U.S.C. § 300jj-31).

> **2.    Achieving the federal government's objectives for health IT requires partnering with healthcare providers.**

24.    The federal government has enlisted private providers—including Capital Health Providers—to help build that nationwide health IT infrastructure.

25.    Consistent with its mandate, the ONC has published guidance for private providers to follow, including through five-year strategic plans. In the 2015-2020 plan, it dictated that "federal agencies" were to "collaborate with . . . private stakeholders to . . . build a culture of electronic health information access and use." ONC, *Federal Health Information Technology Strategic Plan 2015-2020*, available at https://www.healthit.gov/sites/default/files/9-5-federalhealthitstratplanfinal_0.pdf  (last visited March 1, 2023).

26.    And, in the 2020-2025 plan, it noted that this has already happened, saying: the federal government and private sector have worked together to help "digitize the health experience for all individuals and facilitate the progress towards a learning health system that can improve health and care."  ONC, *Federal Health Information Technology Strategic Plan 2020-2025*, available at https://www.healthit.gov/sites/default/files/9-5-federalhealthitstratplanfinal_0.pdf  (last visited March 1, 2023).

27.    Indeed, healthcare providers are uniquely positioned to encourage individual patients to access and use EHR.  After all, there is no point to developing a nationwide health IT infrastructure if an insufficient number of patients use the system.  The government has thus sought to enhance "a provider's ability to influence patient engagement by providing a wider range of technologies and methods for a patient's use."  80 Fed. Reg. 62848.

28.    The government also sets federal specifications for the development of certified EHR technology ("CEHRT").  Private healthcare software companies design, develop, and

maintain electronic systems necessary to support EHR databases.  The federal government sets the standards and technical specifications that such technology must meet.  *See* 45 C.F.R. § 170.315.  Once ONC certifies that a particular developer's product complies with these standards, that developer can market the product to providers as CEHRT.  The government in turn requires that providers use CEHRT in certain instances.

29.    With this framework in place, the federal government has spent the last decade actively seeking to expand the use of EHR and CEHRT among healthcare providers and patients.

### 3.    The federal Meaningful Use Program incentivizes private healthcare providers to expand the use of EHR and CEHRT.

30.    One critical aspect of this strategy has been the CMS' "Meaningful Use" program, now referred to as the Promoting Interoperability Program ("PIP").  42 C.F.R. §§ 495.2-495.370.  This federal program aims to increase patient's "meaningful use" of CEHRT and engagement with electronic health records.  *See, e.g.,* CMS.gov, *Promoting Interoperability Programs*, available at https://www.cms.gov/Regulations-and-Guidance/Legislation/EHRIncentivePrograms ("In 2011, the Centers for Medicare and Medicaid Services (CMS) established the Medicare and Medicaid (EHR) Incentive Programs [now known as the Medicare Promoting Interoperability Program) to encourage eligible professionals (EPs), eligible hospitals, and critical access hospitals (CAHs) to adopt, implement, upgrade, and demonstrate meaningful use of certified electronic health record technology (CEHRT)") (last visited March 1, 2023)).  This program delegated to HHS the authority to set criteria for determining meaningful use.  Pub. L. No. 111-5 § 4101, 123 Stat. 115, 467 (2009) (codified at 42 U.S.C. § 1395w-4).

31.    HHS structured the ensuing Meaningful Use Program in three stages.  The first stage encouraged providers to adopt EHR and established specific objectives for its use.  Subsequent stages gradually increased the criteria for meeting those objectives and demonstrating

that patients continued to access and use EHR in greater numbers.  *See* 75 Fed. Reg. 44321-22 (describing the three stages).

32.    To meet the federal criteria, the providers involved thus needed to both adopt EHR and CEHRT, and show patients' increasing engagement over time.  Providers who met the criteria at each stage qualified for higher federal payments from the government.  *See* 42 U.S.C. § 1395w-4.

33.    For instance, one objective of the Meaningful Use Program has been to "[p]rovide patients the ability to view online, download, and transmit their health information within 4 business days of the information being available...."  80 Fed. Reg. 62815.  Compliance at Stage 2 required showing that more than 50 percent of Medicaid patients received access to view online, download, and transmit to a third party their health information.  That percentage increased to "more than 80 percent" for Stage 3.

34.    Another objective has been to encourage the "capability for patients to send and receive a secure electronic message" with their doctor.  80 Fed. Reg. 62818.  Stage 2 required only the *capability* for patients to send and receive a secure electronic message.  The 2019 requirements for Stage 3 required showing that a certain percentage of patients were actually using the capability.

> **4.    Patient portals are the means by which the healthcare industry— including the federal government—encourages the use of EHR.**

35.    Online patient portals have been the most effective and efficient way to meet many of the objectives in the federal Meaningful Use Program.  CMS anticipated this in some of its earliest rulemaking on the Program.  In announcing Stage 1 objectives for providing "patients with timely electronic access to their health information," CMS intended "that this be information that the patient could access on demand such as through a patient portal...."  75 Fed. Reg. 44356.

36.    The utility of portals continued as the criteria for showing patient engagement developed.  *See* 77 Fed. Reg. 54007 ("Consistent with the Stage 1 requirements, we noted that the

patient must be able to access this information on demand, such as through a patient portal or personal health record (PHR)"); *id.* at 54009 (noting that "[m]any CEHRT vendors already make patient portals available that would meet the certification criteria").

37.     Indeed, before Stage 2 took effect, ONC advised that providers "will have better success meeting meaningful use requirements for stage 2 if you integrate a patient portal effectively in your practice operations," and that "stage 3 requirements may require that you use a patient portal to attest successfully." ONC, *How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use Requirements*, available at https://www.healthit.gov/sites/default/files/nlc_how_to_optimizepatientportals_for_patientengag ement.pdf (last visited March 1, 2023).

38.     Given the goal of increasing patient engagement, it was also not enough just to make "a portal available to patients....  The portal must be engaging and user-friendly, and must support patient-centered outcomes." *Id.*  Driving providers to increase patient engagement and the use of EHR has been a foundation of establishing the nationwide, interoperable health IT infrastructure first envisioned in 2004.

**5.    Capital Health Providers have been expanding the use of EHR and receiving incentive payments from the federal government under the Promoting Interoperability Program.**

39.     Through 2021, PIPs offered incentive payments to providers – like Capital Health – who participate in Medicare and Medicaid when they met specific criteria for increasing patient engagement with electronic health records.  Now, participants that do not demonstrate "meaningful use" during reporting periods may be subject to downward payment adjustments under Medicare. *See* CMS.gov, *2022 Medicare Promoting Interoperability Program Scoring Methodology Fact Sheet*, available at https://www.cms.gov/files/document/2022-scoring-methodology-fact-sheet.pdf (last visited March 1, 2023).  This cause and effect creates a *de facto* requirement for

health care providers like Capital Health tying participation to Medicare payments. Furthermore, CMS reviews Medicare PIP Scoring for compliance and determines whether an entity should receive downward payment adjustments under Medicare. *See id*. Thus, entities like Capital Health are under the supervision and direction of CMS.

40.    The CMS requirements include: adopting federally certified technology, giving patients electronic access to health records and physicians, making it easier for patients to access electronic health information via smartphones, and making the records downloadable and transferable. *See* CMS.gov, *2022 Medicare Promoting Interoperability Program Requirements*, available at https://www.cms.gov/regulations-guidance/promoting-interoperability/2022-medicare-promoting-interoperability-program-requirements (last visited March 1, 2023).

41.    To achieve these goals, CMS recommends that providers create patient "portals" that allow users to communicate directly with their providers and immediately access (or transfer) their medical records. *See, e.g.,* ONC, *Patient Engagement Playbook*, available at https://www.healthit.gov/playbook/pe/introduction/ ("Patient portals hold enormous potential to improve patient care and practice workflow.") (last visited March 1, 2023).

42.    The ONC has specified how providers can optimize such portals, "how a patient portal helps achieve meaningful use requirements," and how a provider can "actively promote and facilitate portal use." ONC, *How to Optimize Patient Portals for Patient Engagement* (2013), available at https://www.healthit.gov/sites/default/files/nlc_how_to_optimizepatientportals_for_patientengagement.pdf (last visited March 1, 2023).

43.    In addition to this guidance, CMS has created its own portal for individuals who access care through traditional Medicare—MyMedicare.gov, offering a model for private providers to follow. To optimize individual engagement with the portal, CMS relies on third-party

marketers, including Google and Facebook. *See generally* Medicare.gov, Privacy Policy, https://www.medicare.gov/privacy-policy (last visited March 1, 2023).

44. CMS uses third-party cookies, analytics, and targeted advertising to increase patient engagement with its portal through outreach and site improvements. *See* MyMedicare.gov, *Privacy Policy*. This includes much of the conduct alleged as unlawful in the Complaint. Indeed, CMS engages Facebook to "place[] a cookie or pixel . . . for conversion tracking on certain pages of a CMS website. [This] allows Facebook Ads to measure the performance of CMS advertisements based on consumer activity and to report the ad performance to CMS." *See* HHS, *Third Party Websites and Applications Privacy Impact Assessment - Facebook Ads* (Sept. 4, 2018), available at https://www.hhs.gov/pia/third-party-websites-and-applications-pia-facebook-ads.html (last visited March 1, 2023).

45. CMS advises that its vendors "may use information collected automatically by visiting CMS.gov, and combine it with data they collect elsewhere for targeted advertising purposes." CMS.gov, *Privacy Policy*, available at https://www.cms.gov/privacy (last visited March 1, 2023). CMS collects user information such as the device used, IP address, geographic location, pages visited, and "Your actions on CMS.gov (like clicking a button)," and uses that data to improve visitors' experience, optimize website content, and "personalize the content we show you on third-party sites." *Id*. Such "tools enable [CMS] to reach new people," thus potentially expanding the use of EHR even further. *Id*.

46. Thus, if it were directly responsible for each patient's care, the federal government itself would be employing a patient portal and the kind of tracking and marketing techniques identified in the Complaint—just as the federal government is already doing with CMS.gov and other sites.

47.    But where it lacks that direct relationship with patients, the federal government uses doctors and hospitals like the Capital Health Providers to deliver "a service the federal government would itself otherwise have to provide." *Def. Ass'n*, 790 F.3d at 469.  The government delegates to those healthcare providers the responsibility for executing the Promoting Interoperability Program, expanding the use of EHR, and developing the nationwide health IT infrastructure.  *Id.* (noting propriety of removal where "'Defendants received delegated authority'" (citation omitted)).

48.    Capital Health's alleged use of techniques identified in the Complaint in this case is how it carries forth its delegated authority.  Capital Health was thus acting under the authority of HHS and its agencies and officers in encouraging use of the Capital Health Websites to patients. *See id.*; *see also Papp*, 842 F.3d at 812 ("When, as occurred in this instance, the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete, that contractor is acting under the authority of a federal officer." (marks and citation omitted)).

**C.    Plaintiffs' Claims Relate to Actions Under Color of Federal Office.**

49.    For removal pursuant to Section 1442(a)(1), the alleged conduct must "have been undertaken 'for or relating to' a federal office." *Papp*, 842 F.3d at 813. To satisfy this aspect of removal, "it is sufficient for there to be a 'connection' or 'association' between the act in question and the federal office." *Def. Ass'n*, 790 F.3d at 471; *see also Papp*, 842 F.3d at 813 (holding recent amendments to statute have fostered "a more permissive view" of this element).  The Third Circuit, specifically, has noted Congress' addition of "or relating to" in 2011 "was intended to broaden the universe of acts that enable Federal officers to remove to Federal court."  *UPMC*, 2020 WL 4381675, at *6 (citing *Def. Ass'n*, 790 F.3d at 471–72).

50.    This hurdle is "quite low." *Id.*  As the *UPMC* decision shows, this requirement is liberally construed and easily met. *UPMC*, 2020 WL 4381675, at *6 ("There is plainly a

connection or association between UPMC's website management and marketing strategies and the Meaningful Use program, particularly the incentives that are tied to patient participation and usability.").

51.     There is more than a *connection* or *association* between Capital Health's alleged conduct and the actions of Capital Health Providers in meeting Meaningful Use/Promoting Interoperability Program criteria. The Complaint alleges that tracking online behaviors and utilizing direct marketing in conjunction with patient portals and public medical websites violates New Jersey privacy law.  But as CMS' own practices demonstrate, those are the methods for communicating with patients, increasing their awareness of patient portals, and expanding the use of EHR—the very objective of the federal Meaningful Use/Promoting Interoperability Program.

52.     As noted above, Plaintiff's Complaint focuses on Capital Health' use of its public- and patient-facing website.  Plaintiff alleges that "Defendant disclosed information about its patients . . . to Facebook and other third parties without their patients' knowledge, authorization, or consent."  Exhibit A (Complaint), ¶ 3.  Plaintiff specifically asserts that Capital Health provide website functions to search for clinicians and investigate personal health issues.  *Id.* at ¶¶ 83-89. And, Plaintiff alleges that these website functions collect sensitive information inputs, which are simultaneously transferred to Facebook for digital marketing purposes. *Id.* at ¶ 86.

53.     Plaintiff contends that this transmission occurred through a web-tracking tool known as "the Meta Pixel."  *Id.* at ¶ 53. Further, she claims that "[a] third-party website that incorporates Meta Pixel benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic."  *Id.* at ¶ 77

54.     From her own experience, Plaintiff asserts that she "visited Defendant's website . . . entered data, including sensitive medical information, such as details about her medical condition and doctor . . . [and] believed that her interactions with Defendant's website were private and

16

would not be shared with anyone besides her health care providers and their staff." *Id.* at ¶ 94. Plaintiff further alleges that the data she voluntarily input into Capital Health's public website was somehow transmitted to Facebook without consent. *See id.* at ¶ 96.

55.    The foregoing allegations are precisely what the Meaningful Use/Promoting Interoperability Program envisions—increased and simplified patient interaction with health care providers by way of modernized information technology infrastructure. As Plaintiff herself points out, these tracking tools "analyze a user's experience and activity on the website to assess the website's functionality and traffic" for the betterment of the user experience. *Id.* at ¶ 77.

56.    In substance, Plaintiff's Complaint attacks Capital Health efforts to satisfy – and carry out – the PIP criteria and expand the use of EHR. In other words, for the Court to rule for Plaintiff in this lawsuit means truncating the efforts Capital Health has undertaken to meet what the federal government has identified as its gold standard for modernized patient-provider interaction. It would substantially interfere with achieving the policy objectives set forth in the HITECH Act and its implementing regulations. *Golden*, 934 F.3d at 309 ("The central aim of the federal officer removal statute is to protect officers of the federal government from interference by litigation in state court" (marks and citation omitted)). Federal review pursuant to 28 U.S.C. § 1442(a)(1) is therefore warranted.

## D.    Capital Health Raises Colorable Federal Defenses to Plaintiff's Claims.

57.    The final element for federal officer removal requires that the defendant identify a federal defense. *Def. Ass'n*, 790 F.3d at 472. This, too, is broadly construed in favor of federal jurisdiction. *Id*. at 472-74. The federal defense "need only be plausible." *United States v. Todd*, 245 F.3d 691, 693 (8th Cir. 2001). "To be 'colorable,' the defense need not be 'clearly sustainable,' as the purpose of the statute is to secure that the validity of the defense will be tried in federal court." *Isaacson*, 517 F.3d at 139.

ME1 44305500v.1

58.    Arguments that federal law preempts state law suffice to warrant removal under this element.  *Def. Ass'n*, 790 F.3d at 473-74.  Similarly, where a complaint alleges the presence of a duty under federal law, a federal defense exists for removal purposes where the defendant denies it violated any such duty.  *Id*. at 473 (holding this element satisfied because defendant "claim[ed] that it was not violating the terms of" a federal statute); *see also Golden*, 934 F.3d at 311 (holding that defendant raised a colorable federal defense by denying that the records at issue "are federal records within the meaning of 44 U.S.C. § 3301").

59.    Capital Health will assert several colorable federal defenses to the claims at issue here.  By way of non-limiting examples, *first*, Capital Health will contend that the data at issue— the content of web searches, IP addresses, cookies, and browser fingerprints—are not sensitive health information subject to HIPAA.  *See* Exhibit A (Complaint), ¶ 86.  Plaintiff does not allege that Capital Health disclosed medical records or secure communications between patients and physicians.  This case instead concerns only generic online information that is anonymous or linked only to a specific computer, not a person.

60.    Although Plaintiff has deliberately avoided reference to HIPAA or any other federal statue in the Complaint in an effort to preclude removal, it does not transform Plaintiff's theory, much less change the fact that the Court must interpret federal law to address her allegations.  *See Federated Dep't Stores v. Moitie*, 452 U.S. 394, 397 n.2 (1981) ("courts will not permit plaintiff to use artful pleading to close off defendant's right to a federal forum") (citation and quotation omitted).  Plaintiff specifically alleges that Capital Health has disclosed personal healthcare information, which is protected by HIPAA.  *See* Exhibit A (Complaint), ¶ 19.  Further, Plaintiff asserts that  Capital Health, *as a health care provider*, has fiduciary, common law, and statutory duties to protect the confidentiality of patient information and communications.  *Id.* ¶ 14.  Such

allegations encapsulate a claim that Capital Health violated its HIPAA compliance obligations. *See UPMC*, 2020 WL 4381675, at *6.

61.     One federal court already has rejected the argument that HIPAA protects the kind of information at issue here.  *See Smith*, 262 F. Supp. 3d at 954 (holding that IP addresses and similar information did not "relate[] specifically to Plaintiffs' health" and were not "protected health information" under HIPAA).  *Smith* alone makes Capital Health's defense colorable and satisfies the final requirement for removal under Section 1442(a)(1).  *See Golden*, 934 F.3d at 311 (holding that a federal defense was present where defendant denied any violation of federal law); *Def. Ass'n*, 790 F.3d at 474 (same).

62.     *Second*, certain state-law privacy standards are preempted by federal law, including HIPAA.  *See* 45 C.F.R. § 160.203.  The possibility of preemption also is enough to present a federal defense for removal purposes.  *See Def. Ass'n*, 790 F.3d at 474 (permitting removal on the basis of preemption).

63.     *Finally*, the entire nature of Capital Health's involvement in the Meaningful Use/ Promoting Interoperability Program is "inherently federal in character because the relationship" between Capital Health and HHS "originates from, is governed by, and terminates according to federal law."  *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001) (holding that state law claims stemming from defendant's representations to a federal agency were preempted). Federal judicial review is available to assess allegations about the nature of that relationship.  *See Def. Ass'n*, 790 F.3d at 474 (permitting removal on the basis of *Buckman* preemption).

## CONCLUSION

64.     For these reasons, defendant Capital Health System Inc., d/b/a Capital Health, removes the above-styled and captioned case pending in the Superior Court of New Jersey, Mercer

County, to this Court under 28 U.S.C. § 1442(a)(1) and requests that further proceedings be conducted in the United States District Court for the District of New Jersey.

65.    Nothing in this Notice of Removal shall be interpreted as a waiver or relinquishment of Capital Health's right to assert any and all defenses or objections to the Complaint, including but not limited to Plaintiff's class allegations.

66.    If there are any questions that arise as to the propriety of removal of this action, Capital Health respectfully requests the opportunity to submit briefing, argument, and additional evidence as necessary to support removal of this case.

Dated: March 3, 2023                              Respectfully submitted,

                                                  /s/ *Scott S. Christie*
                                                  Scott S. Christie
                                                  Matthew A. Sklar
                                                  Katarina Overberg (*pro hac vice* to be applied)
                                                  McCARTER & ENGLISH, LLP
                                                  Four Gateway Center
                                                  100 Mulberry St.
                                                  Newark, NJ 07172
                                                  Phone: (973) 848-5388
                                                  Fax: (973) 297-3981
                                                  schristie@mccarter.com
                                                  msklar@mccarter.com
                                                  koverberg@mccarter.com

                                                  *Counsel for Capital Health System, Inc.*

### CERTIFICATE OF SERVICE

I hereby certify that this 3rd day of March, 2023, I served a copy of the foregoing Notice of Removal, together with all exhibits thereto, on the following counsel via first class mail and via electronic mail as follows:

Jason J. Rozger
Bruce Menken
MENKEN, SIMPSON, & ROZGER, LLP
80 Pine Street, 33rd Floor
New York, NY 10005
jrozger@nyemployeelaw.com
bmenken@nyemployeelaw.com

Foster C. Johnson
David Warden
AHMAD, ZAVITSANOS, & MENSING, P.C
1221 McKinney Street, Suite 3460
Houston, Texas 77010
fjohnson@azalaw.com
dwarden@azalaw.com

Samuel J. Strauss
Raina C. Borrelli
TURKE & STRAUSS LLP
613 Williamson St., Suite 201
Madison, Wisconsin 53703
sam@turkestrauss.com
raina@turkestrauss.com

/s/ *Scott S. Christie*
Scott S. Christie
*Counsel for Capital Health System, Inc.*

ME1 44305500v.1